UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITES STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION, et al.,

      Plaintiffs,

v.                         Case No. 8:12-cv-1325-T-33MAP

SUNTRUST BANK,

      Defendant.

_____/

**ORDER**

This matter comes before the Court pursuant to Plaintiff Equal
Employment Opportunity Commission's Motion for an Adverse
Inference Jury Instruction Based on Defendant's Bad Faith
Destruction of Video Surveillance Evidence, filed on November 22,
2013. (Doc. # 141). Defendant SunTrust Bank filed a Response in
Opposition (Doc. # 164) on December 20, 2013. For the reasons
that follow, the Court denies without prejudice the EEOC's request
for an adverse inference jury charge. The Court, however, grants
the EEOC's alternative request that it be permitted to introduce
evidence regarding SunTrust's surveillance video program,
SunTrust's policies regarding preservation of surveillance videos,
and SunTrust's failure to preserve the surveillance videos in
question.

I.    **Background**

A. **Marcia Vescio**

Marcia Vescio was employed at SunTrust's Gulf Gate branch from May of 2006, through November of 2009, as a Financial Services Representative. (Doc. # 18 at ¶¶ 26-27). Kenneth Sisson supervised Vescio and began working at SunTrust as a Branch Manager on November 17, 2008. (Vescio Decl. Doc. # 124-4 at ¶ 4; Doc. # 83-3 at 1). According to Vescio, Sisson stared at her breasts every other day and trapped her between his groin area and the bank teller's counter by standing inches behind her. (Vescio Decl. Doc. # 124-4 at ¶¶ 15, 21). Vescio testified that Sisson stood so close behind her that she "was constantly afraid that one day his penis was going to touch [her] because he was always so close." (Id. at ¶ 26). In these situations, Vescio contends that Sisson spoke with his mouth so close to her body that she could feel his breath on her neck. (Id.). Vescio also indicates that Sisson said, "I wish you had legs like that" comparing her to a bank customer who was also a Hooters waitress. (Vescio Dep. Doc. # 124-3 at 122). Vescio also alleges that while Sisson was touching her shoulder and standing uncomfortably close to her, he commented "just between me and you, I love Brazilians." (Vescio Decl. Doc. # 124-4 at ¶ 5). In addition, Vescio alleges that Sisson humiliated her by frequently directing her to say the word "peanuts" because, with

2

her Brazilian accent, it sounded like she was saying "penis." (Id. at ¶ 23). Vescio testified that Sisson's conduct "always" brought her to tears. (Vescio Dep. Doc. # 124-3 at 282). Vescio's employment was terminated on November 17, 2009. (Doc. # 141-14 at 3).

### B. Heather Caldwell

Heather Caldwell began her employment at SunTrust's Gulf Gate branch on April 23, 2007, and was supervised by Sisson after he came to the branch. (Doc. # 141-14 at 1). Caldwell alleges that Sisson made inappropriate comments to her, for instance, remarking after she lost weight from running that she was "losing" her "ass" and making comments about her legs as well as about Hooters waitresses. (Caldwell Dep. Doc. # 125-7 at 38, 41, 42, 150). He allegedly told Caldwell that she would get more accounts if she donned the attire of a Hooters waitress. (Id. at 149). Caldwell also contends that Sisson stared at her chest. (Id. at 47). Caldwell spoke to Branch Manager Denise McDonald about Sisson's inappropriate, sexual behavior on a weekly or daily basis between January 2009, and August 2009. (Id. at 133-37). Caldwell also reported to Branch Manager Erin Hall that Sisson was using sexually inappropriate language. (Id. at 144-45). Finally, Caldwell reported "sexual harassment" to Area Manager Kevin Osborne, while "bawling her eyes out." (Id. at 124-28). Caldwell resigned from

3

her position at SunTrust on August 14, 2009.  (Doc. # 141-14 at 1).

## C. **Jena Lynch**

Jena Lynch began her employment as a teller at SunTrust's Southgate branch in February of 2008. (Lynch Decl. Doc. # 124-2 at ¶¶ 4, 6). In January of 2009, Lynch was transferred to the Gulf Gate branch. (Id. at ¶ 6). Only 20-years old at the time, Lynch contends that Sisson, her 40-year old supervisor, made several offensive remarks to her, frequently stared at her in a sexual way, and, on a daily basis, would trap her behind the teller counter by standing less than two inches from her backside. (Id. at ¶¶ 9-14, 21-23, 26).  She explained that she could not move forward because of the teller counter and she could not move backwards because she did not want to back up into his groin area. (Id. at ¶¶ 10, 12).  During these times, Lynch contends that Sisson would speak with his face right next to hers so that she could feel his breath on her face. (Id. at ¶ 11).  In contrast, Lynch remarked that Sisson stood a respectable distance from male employees. (Id. at ¶ 19). Lynch testified that Sisson's conduct made her feel "sick at the prospect of going to work," "trapped," "cornered," "physically threatened," "extremely distressed, anxious, and embarrassed." (Id. at ¶¶ 11-13, 49).  Lynch was terminated on July 10, 2010. (Doc. # 141-14 at 4).

4

D. **Delia Timaru-Paradis**

Delia Timaru-Paradis began working for SunTrust as a Financial Services Representative in October of 2008, and was transferred to the Gulf Gate branch in September of 2009. (Timaru-Paradis Decl. Doc. # 126-1 at ¶¶ 3, 9). Sisson was Timaru-Paradis' supervisor and, according to Timaru-Paradis, he made inappropriate comments to her, for instance, suggesting that she wear a bathing suit to work to attract customers. (Id. at ¶¶ 14-15). She also alleges that he constantly made comments about her backside and remarked, after she gained weight: "You finally have some meat on your ass." (Id. at ¶ 38). According to Timaru-Paradis, he also asked her about her sex life "on a weekly if not daily basis," and stared at her breasts on an almost daily basis. (Id. at ¶¶ 25, 42). She also claims that Sisson threatened "maybe tomorrow you will not be back to your job" when she declined his invitation to go out to dinner with him. (Id. at ¶ 35).

Timaru-Paradis reported to her immediate supervisor Tunde Kakucs that Sisson would touch her inappropriately on a daily basis. (Id. at ¶ 26). According to Timaru-Paradis' declaration, Sisson "touch[ed]," "patt[ed]," "caressed," "grab[bed]" and "fondled" her body parts, including her hair, face, ears, neck, shoulders, back, arms, thighs, and buttocks. (Id. at ¶¶ 25-33, 37-38). One evening in May of 2010, Sisson allegedly followed Timaru-

5

Paradis to her car, "grabbed [her] forcefully and held [her] against [her] will." (Id. ¶ 59).  He kissed her and she "had to shove him with all of [her] might to get away from him." (Id.). Timaru-Paradis testified that Sisson's alleged verbal and physical harassment made her feel "dirty and disgusted," "horrified," "shocked," "extremely uncomfortable," and "physically threatened." (Id. at ¶¶ 29-30, 33, 38, 48).

When she reported Sisson's conduct to Area Manager Osborne, he allegedly remarked: "Quite frankly, you are frustrating me right now.  And you should remember who . . . is giving you your paycheck." (Id. at ¶ 60).  On July 7, 2010, Timaru-Paradis was terminated. (Doc. # 141-14 at 2).

**E.   Charges of Discrimination and Complaint**

On August 11, 2010, Caldwell filed a Charge of Discrimination against SunTrust describing sexual harassment by Sisson. (Doc. # 141-5).  On August 23, 2010, Shelley Jones, SunTrust's Human Resources Advisor, authored an email to Theresa Hammond, SunTrust's in-house counsel, about Caldwell's Charge and said she would not be surprised to see more complaints down the line, referring specifically to Timaru-Paradis, Caldwell, Vescio, and Lynch.  (Doc. # 141-6).

Jones was correct, as Timaru-Paradis filed a Charge of Discrimination against SunTrust on September 9, 2010 (Doc. # 141-

6

9 at 2), Vescio filed a Charge of Discrimination on September 17, 2010 (Doc. # 141-7), and Lynch filed a Charge of Discrimination on November 2, 2010 (Doc. # 141-8).

On June 14, 2012, the EEOC filed a Title VII sexual harassment complaint against SunTrust on behalf of charging parties Vescio, Lynch, and Timaru-Paradis. (Doc. # 1). In August of 2012, Timaru-Paradis, Caldwell, and Vescio filed motions to intervene in the action via separate counsel (Doc. ## 5, 7), which this Court granted. (Doc. # 13).  After granting the motions to intervene, the Court directed that a single consolidated complaint be filed. (Doc. # 13).  On November 9, 2012, "Plaintiff United States Equal Employment Opportunity Commission and Plaintiff's in Intervention Second Amended Consolidated Complaint Against Defendant[]" was filed. (Doc. # 18).

On November 4, 2013, Caldwell dismissed her claims against SunTrust with prejudice. (Doc. # 122).  At this juncture, both Vescio and Caldwell have resolved their disputes with SunTrust, but it appears that the EEOC intends to continue forward in the prosecution of Vescio's claims. (Doc. # 152 at 4).[1]

---

[1] The EEOC has indicated in a prior submission that "notwithstanding any private settlement, the EEOC is still pursuing relief on behalf of Vescio under Title VII." (Doc. # 152 at 4).

## F. <u>Destruction of Video Footage</u>

SunTrust's Florida branches, including the Gulf Gate branch, are equipped with security cameras aimed at the teller stations, entrances, and exits.  (Doc. # 164 at 7; Doc. # 93 at 3). SunTrust's Document Retention Policy provides for the automatic destruction of surveillance images every 90 days, unless other circumstances exist, such as the video being used for investigation or litigation purposes. (Doc. # 164 at 3).  SunTrust's policies, however, call for the retention of all materials used in an investigation for a period of two years. (Doc. # 141-18 at 17).

On July 6, 2010, prior to filing her Charge of Discrimination, Timaru-Paradis formally reported to Jones that Sisson sexually harassed her, she worked unpaid overtime, and she had contacted an attorney.  (Doc. # 83-1, 83-2 at 8).  As of July 6, 2010, following its Document Retention Policy, SunTrust would have had access to video surveillance footage going back 90 days, or since at least April 7, 2010.  (Doc. # 164 at 3).

In response to Timaru-Paradis' complaints to Jones, SunTrust initiated an investigation, which included reviewing video surveillance footage from the Gulf Gate branch.  (Doc. # 83-3 at 2).  Corporate Security Officer Cynthia Rodgers emailed Jones on July 29, 2010, with her review of start and end times for Timaru-Paradis' work based on the surveillance videos.  (Doc. # 83-4 at

8

3).  On August 17, 2010, Jones asked Rodgers to review the camera footage for a second time regarding Timaru-Paradis' overtime claims.  (Id. at 1).

Jones authored an "investigation summary" regarding Timaru-Paradis' claims of sexual harassment and wage and hour violations. (Doc. # 83-3).  Specifically referring to the surveillance videos, Jones classified Timaru-Paradis' wage and hour claims as "Not Substantiated" noting, among other things, that "Review of cameras in office by Security partner, Rogers, showed Timaru-Paradis' times in and out of the office were consistent with her time records." (Id. at 2).  The same Investigation Summary classified Timaru-Paradis' allegations that Sisson "made sexual comments and demonstrated unwelcome behavior" as "Partially Substantiated." (Id. at 1-2).  The Investigation Summary also reported that during the investigation, SunTrust received an anonymous hotline complaint "with similar allegations." (Id. at 3).

After using the video surveillance footage to investigate Timaru-Paradis' claims, SunTrust allowed the surveillance videos to be taped over and did not retain or preserve the footage.  The EEOC never had the opportunity to view the surveillance video footage.

When the EEOC timely requested surveillance video footage during discovery in a December 11, 2012, request for production

(Doc. # 141-12), SunTrust responded simply that the video footage no longer existed. (Doc. # 141-13).  When the EEOC moved to compel SunTrust's litigation hold documents in order to discover SunTrust's preservation attempts with regard to the videos (Doc. # 83), SunTrust admitted that "there was video surveillance that existed at one time but is no longer in existence" and that SunTrust "did not take affirmative steps to prevent such videos from being taped over or otherwise deleted." (Doc. # 94 at 2, 4). After the expiration of the discovery deadline, the EEOC sought discovery regarding the footage, which the Magistrate Judge denied. (Doc. # 97).

Claiming bad faith destruction of the evidence, the EEOC now requests an adverse inference jury instruction, "that the video would have shown Sisson sexually harassing both Timaru-Paradis and Lynch from April 6, 2010, to July 10, 2010, and specifically getting uncomfortably close to both Timaru-Paradis and Lynch while they worked on a daily basis, staring at them in a sexual way, caressing Timaru-Paradis on the arm, shoulders, and neck in a sexual way, and grabbing Timaru-Paradis on her thighs and shoulders on at least one occasion." (Doc. # 141 at 24, n.13).[2]  In the

---

[2] The EEOC explains that the relevant video footage (depicting events from April to July 2010), would not have shown either Vescio or Caldwell, because their employment ended prior to April 2010.

alternative, the EEOC requests the opportunity to present evidence to the jury regarding the surveillance videos and SunTrust's failure to preserve the same.

## II. Spoliation of Evidence

"Spoliation is the intentional destruction, mutilation, alteration, or concealment of evidence." St. Cyr v. Flying J, Inc., No. 3:06-cv-13-J-33TEM, 2007 U.S. Dist. LEXIS 42502, at *7 (M.D. Fla. June 12, 2007)(citing Black's Law Dictionary 1437 (8th ed. 2004)).   Generally, spoliation is established when the party seeking sanctions proves that (1) the missing evidence existed at one time; (2) the alleged spoliator had a duty to preserve the evidence; and, (3) the evidence was crucial to the movant being able to prove its prima facie case or defense.   Managed Care Solutions, Inc. v. Essent Healthcare, Inc., 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010); S.E. Mech. Servs., Inc. v. Brody, 657 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009); Floeter v. City of Orlando, No. 6:05-cv-400-Orl-22KRS, 2007 WL 486633, at *5 (M.D. Fla. Feb. 9, 2007).

Federal courts possess the inherent power to regulate litigation, and broad discretion to sanction litigants for abusive practices.   Telectron, Inc. v. Overhead Door Corp., 116 F.R.D. 107, 126 (S.D. Fla. 1987).   If a court determines that a sanction for spoliation of evidence is warranted, the "determination of an

appropriate sanction . . . is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." Optowave Co., Ltd. v. Nikitin, No. 6:05-cv-1083-Orl-22DAB, 2006 WL 3231422, at *7 (M.D. Fla. Nov. 7, 2006).

"[A]s sanctions for spoliation, courts may impose the following: (1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." Flury v. Daimler Chrysler Corp., 427 F.3d 939, 945 (11th Cir. 2005). Although outright dismissal of a lawsuit is within the court's discretion, Chambers v. Nasco, Inc., 501 U.S. 32, 45 (1991), it is the most severe sanction that a federal court can impose and is appropriate only where alternative lesser sanctions will not suffice. Flury, 427 F.3d at 944.

In this Circuit, a party's failure to preserve evidence rises to the level of sanctionable spoliation "only where the absences of that evidence is predicated on bad faith," such as where a party tampers with, purposefully loses, or intentionally destroys relevant evidence. Managed Care Solutions, Inc., 736 F. Supp. 2d at 1322; Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997). Where there is no direct evidence of bad faith, the moving party can show by circumstantial evidence that the spoliator acted in bad faith by showing that "(1) evidence once existed that could

fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." Managed Care Solutions, Inc., 736 F. Supp. 2d at 1323.

It is undisputed that the surveillance video at issue existed at one time. (Doc. # 164 at 6). The parties also agree that as of September 21, 2010, when SunTrust received Timaru-Paradis' Charge of Discrimination, there would have been two weeks of video footage of Timaru-Paradis at the Gulf Gate branch due to SunTrust's 90-day retention policy. (Id.). SunTrust admits it was under a legal duty to preserve such video, but in its Response states, "[u]nfortunately, this two week period was completely taped over two weeks after September 21, 2010 pursuant to SunTrust's Document Retention Policy." (Doc. # 164 at 6).

The EEOC and SunTrust disagree as to: (1) whether SunTrust was under a duty to preserve the surveillance video prior to September 21, 2010 (because Timaru-Paradis formally reported sexual harassment to Jones on July 6, 2010), (2) whether the evidence was crucial to the EEOC being able to prove its prima facie case, and

(3) whether the absence of the video evidence was a result of bad faith by SunTrust.

## A. **The Duty to Preserve the Video Footage**

Both parties agree that SunTrust had a duty to preserve the surveillance videos.  The parties disagree about when that duty arose.  The EEOC alleges SunTrust had a duty to preserve the videos beginning on July 6, 2010, when Timaru-Paradis complained to Jones about sexual harassment, unpaid wages, and other concerns and told Jones she had contacted an attorney.  (Doc. # 141 at 15).  SunTrust on the other hand, claims it was under a duty to preserve the evidence as of September 21, 2010, after it received Timaru-Paradis' Charge of Discrimination.  (Doc. # 164 at 6).

The Court finds in favor of the EEOC on the issue of when the duty to preserve evidence arose and finds that SunTrust had a legal duty to preserve evidence, including surveillance videos, beginning July 6, 2010, when Timaru-Paradis reported to Jones that she was the victim of sexual harassment as well as overtime violations and had retained a lawyer. See Simon Prop. Group, Inc. v. Lauria, No. 6:11-cv-1598-Orl-31KRS, 2012 U.S. Dist. LEXIS 184638, at *19 (M.D. Fla. Dec. 13, 2012)("A party has an obligation to retain relevant documents when litigation is reasonably anticipated."); Telectron, Inc., 116 F.R.D. at 126 ("Sanctions may be imposed against a litigant who is on notice that documents and

14

information in its possession are relevant to litigation, or potential litigation).

Here, it is not disputed that Timaru-Paradis reported sexual harassment and other alleged violations of federal law to Jones on July 6, 2010, and specified that she had retained an attorney. (Doc. # 83-2 at 8). Jones reaffirmed her knowledge that litigation was imminent on July 14, 2010, and her notes from that day specify that the following items should be evaluated: "camera, computer log-in, notebook." (Doc. # 83-2 at 9). Based on Jones' response to Timaru-Paradis' communications on July 6, 2010, the Court reaches the conclusion that SunTrust should have anticipated litigation, specifically, sexual harassment claims, and should have started preserving evidence as of July 6, 2010.

## B. **Evidence Crucial to the EEOC's Prima Facie Case**

The video surveillance would have been visual evidence of whether the sexual harassment alleged by the claimants occurred. Due to SunTrust's position that the claimants are not telling the truth, the video surveillance is crucial to the EEOC's ability to prove its prima facie case.[3] SunTrust contends that video surveillance is not the only way to prove what occurred because there were several other employees besides Plaintiffs working at

---

[3] For instance, in response to the current Motion, SunTrust argues that "Paradis' allegations of sexual harassment get worse every time she tells her story." (Doc. # 164 at 5).

15

the Gulf Gate branch, many of whom Timaru-Paradis named as eyewitnesses. (Doc. # 164 at 16).

Although SunTrust is correct that other employees could testify about what they observed while working at the Gulf Gate branch, the video surveillance would have been unbiased, direct evidence about what occurred between Sisson and the Plaintiffs. Without the video surveillance, the parties must now engage in "he-said, she-said" arguments, which could have been avoided to some extent had the video been preserved.

SunTrust also asserts the unavailing argument that the surveillance tapes were focused on the entrances, exits, and tellers, and therefore, such tapes would not have captured Sisson's alleged touching of Timaru-Paradis, as Timaru-Paradis claims that he touched her at her desk, in his office, by the printer, in the hallways, in the client welcoming areas, in the parking lot, and in other unspecified areas. However, the Court notes that Timaru-Paradis is alleging that she worked in a sexually hostile environment. Her allegations that Sisson repeatedly touched her in unwelcomed sexual advances do not stand in isolation. In evaluating a sexual harassment suit, the finder of fact may also consider whether in the plaintiff's presence, an alleged harasser also subjected other employees to unwelcomed, demeaning, threatening, or abusive treatment. For instance, in Faragher v.

City of Boca Raton, 864 F. Supp. 1552 (S.D. Fla. 1994), pursuant to a bench trial, the court found that Faragher was subjected to a severe and pervasive sexually hostile work environment: "The Court finds that Terry's and Silverman's conduct unreasonably interfered with Faragher's work performance by promoting an environment where female lifeguards were considered fair game for uninvited touching and offensive remarks." Id. at 1562.   In reaching this determination as to Faragher, the court considered the manner in which the supervisors, Terry and Silverman, treated Faragher as well as her coworkers. "Terry had a propensity to touch female employees . . . without their consent." Id. For instance, "Terry touched Ewanchew's buttocks and breast, Faragher's buttocks, Barta's buttocks, Herrington's thigh, Nye's hip, and Buhr's and Chisesi's necks." Id.   Terry and Silverman also "used offensive language when speaking to female employees such as Ewanchew, Herrington, and Bonner" such as commenting to Herrington that "her nipples showed through her swimsuit" and making explicit and suggestive comments to Ewanchew, Evans, and Nye.   Id.[4]

---

[4] The Eleventh Circuit reversed the district court's decision on the issue of whether the employer was vicariously liable for the acts of the supervisor. Faragher v. City of Boca Raton, 111 F.3d 1530 (11th Cir. 1997).   The Supreme Court reversed and directed that the judgment in favor of the employees issued by the district court be reinstated. Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

Here, tellers, including Lynch and Vescio, allege that Sisson trapped them between his groin area and the teller counter and leered at them in a sexual way at the teller counter. Timaru-Paradis alleges in her declaration that, in addition to subjecting her to unrelenting sexual harassment, he subjected bank customers and employees, including tellers such as Lynch, to harassment: "While I was having a transaction processed by one of the tellers, Sisson was giving Jena Lynch a very difficult time asking completely inappropriate questions [and] implying she was going to have sex with a date. Sisson was hovering behind Jena Lynch, very close to her such that he was almost touching her body with his, and asking her sexually suggestive questions . . . while having a big leering smile on his face." (Timaru-Paradis Decl. Doc. # 126-1 at ¶ 22)

SunTrust does not dispute that the surveillance cameras were focused on the teller counter, among other bank locations. (Doc. # 164 at 7).  Since the tapes have been destroyed, the Court does not know whether any footage would have supported the allegation that Sisson trapped and leered at the tellers as described by Timaru-Paradis, Lynch, and others, but such evidence (even if it did not show Sisson touching Timaru-Paradis) would be highly relevant to this action.  As demonstrated in Faragher, a supervisor's sexual harassment of a plaintiff's co-worker may also

18

serve as relevant evidence in support of a plaintiff's hostile work environment sexual harassment case. This point is also underscored by the determination in Edwards v. Wallace Community College, 49 F.3d 1517 (11th Cir. 1995), that, in the context of a Title VII case predicated on racial discrimination, "A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her." Id. at 1522; see also Quarles v. Con-way Freight, Inc., No. 8:07-cv-200-T-27MAP, 2008 U.S. Dist. LEXIS 37747, at *16 (M.D. Fla. May 8, 2008)(holding that a harasser's conduct aimed at other employees may be relevant to whether the plaintiff demonstrated that the workplace is permeated with discriminatory intimidation, ridicule, and insult).

The Court also rejects SunTrust's suggestion that the videos captured by the surveillance cameras were of low quality and would have not been helpful evidence. In support of this contention, SunTrust has filed a blurry screen shot supposedly depicting Timaru-Paradis embracing a bank client. (Doc. # 164-7). During discovery, Timaru-Paradis stated that she could not identify "who is in the grainy picture." (Doc. # 164-8 at 3). However, there is a vast difference between streaming video coverage and a screen shot. While a screen shot may indeed be blurry, that is not an indication that the video from which it was extracted was of poor quality.

After considering the parties' contentions regarding the quality of the video and its probative value, the Court determines that the destroyed video footage was crucial to the EEOC with respect to proving its prima facie case.

## C. **Bad Faith**

Having determined that the relevant surveillance video existed, that SunTrust had a legal duty to preserve the surveillance video, and that the surveillance video was crucial to EEOC's ability to establish a prima facie case, the Court must now determine whether SunTrust acted in bad faith.

The EEOC points out that SunTrust reviewed the surveillance video on multiple occasions to defend itself against Timaru-Paradis' overtime claims, but then failed to preserve the tapes without providing EEOC a chance to review the tapes. (Doc. # 141 at 21). The EEOC also notes that SunTrust failed to comply with its own retention policies because it did not retain the video used for investigation into Timaru-Paradis' claims for two years. (Doc. # 141 at 9, n.9).

SunTrust agrees it was under a duty to preserve that evidence which was destroyed, but it remarks that there is no evidence that SunTrust singled out the surveillance video for destruction. Although SunTrust has filed numerous motions, briefs, and other submissions regarding the surveillance videos (Doc. ## 94, 133,

164), it has never provided an adequate explanation of why it isolated and carefully reviewed the tapes as a part of its investigation into Timaru-Paradis' claims but then put the same footage back into circulation to be taped over.  In fact, SunTrust describes the evisceration of the surveillance footage as simply "unfortunate."  (Doc. # 164 at 6).

This Court has previously addressed spoliation issues and has determined in a number of cases that destruction of evidence did not amount to bad faith.  For instance, in Sterbenz v. Anderson, No. 8:11-cv-1159-T-33TBM, 2013 U.S. Dist. LEXIS 44568, at *9 (M.D. Fla. Mar. 28, 2013), this Court held that a failure to maintain evidence for presentation at trial may certainly be imprudent, but such actions or inactions do not necessarily amount to bad faith as required to impose an adverse inference spoliation sanction. Id.  However, in that case, two individuals were engaged in litigation about damage to a dwelling after a toilet leak. Id. at *2.  Neither party had a policy in place regarding the retention of evidence.  In addition, in that case, the evidence that was not preserved was a soiled garment which had been in a backed up toilet. Id. at *5.

In contrast, SunTrust had a written document retention policy, a staff trained to investigate claims and to retain evidence, and employed various human resources professionals,

investigators, and an in-house counsel to ensure compliance with its policies.  Further, SunTrust was aware of the evidentiary value of the surveillance videos because it utilized those very videos to defend against Timaru-Paradis' overtime claims.  Furthermore, SunTrust's "investigation planning checklist" reminds its employees to "identify and obtain all available related documents or other evidence (e.g., policies, email, security video); [and] [a]rrange for preservation or protection of all documents from destruction or alteration." (Doc. # 141-1 at 16).

Here, there is no direct evidence showing that any SunTrust employee or representative directed that the tapes be destroyed in an effort to gain an unfair advantage in this suit.  And the Court acknowledges that "mere negligence in losing or destroying the records is not enough for an adverse inference." Bashir, 119 F.3d at 931.  However, the bad faith standard can also be met by the presentation of circumstantial evidence.  In Britton v. Wal-Mart Stores, E., L.P., No. 4:11-cv-32-RH/WCS, 2011 U.S. Dist. LEXIS 86901, at *38 (N.D. Fla. June 8, 2011), the plaintiffs (a mother and her minor children) sued Walmart when Walmart accused the minor children of stealing a digital camera, forcibly detained the children (one child having a disability), and the stress of the incident caused the mother of the children to sustain a heart attack at the store. The Walmart manager admitted that surveillance

22

tapes were available showing all of the events in question, but he did not take any action to prevent the images from being taped over. Id. at *21-22. Just as in the present case, a manager reviewed the tapes (in that case, to determine whether to fire the Walmart employee who detained the children) and after using the tapes for its own purposes, allowed the tapes to be recorded over. Id. at *22. The Britton court found that the manager "fully understood the importance of the indoor surveillance videos of the Britton children, looked at them, knew that the videos would disappear over time if not preserved . . . and consciously chose to let that happen since the videos were damaging to Walmart's defense against claims that might be brought by the Britton family." Id. at *21-22.

As to bad faith, the court noted:

"[B]ad faith" does not mean malice, that is, intentional misconduct. While evidence of intentional destruction of evidence would surely show "bad faith," it is not a condition precedent. Indeed, proof of malicious destruction of evidence would rarely be available where one party has full control of the evidence. Instead, . . . "bad faith" exists in a case like the case at bar where, (1) the evidence is plainly central to a potential claim that might arise and the party knows it or reasonably should know it, (2) the lack of the evidence will significantly benefit the party who fails to preserve it, (3) the evidence of what happened is unsettled and probably would be significantly clarified if the lost evidence [was] still available, and (4) the reasons given [] for not preserving the critical evidence are suspiciously irrational.

23

Id. at *38.[5]

Here, SunTrust admits that it had a duty to preserve the evidence, reviewed the evidence not once but twice in an effort to defend against Timaru-Paradis' overtime claims, did not provide the evidence to the EEOC, and admittedly allowed the relevant footage to be taped over.  It did so in contravention of its own policies, which would require it to preserve the evidence for two years.[6]

This conduct comes close to crossing into the realm of bad faith.  However, at this juncture, the Court has not been fully persuaded that SunTrust's actions breach the bad faith boundary. In this Circuit, district courts regularly deny adverse inference

---

[5] Britton v. Wal-Mart Stores, E. L.P., 2011 U.S. Dist. LEXIS 86901 is a Report and Recommendation.  The district court adopted the Report and Recommendation to the extent that it recommended an adverse inference jury instruction: "The jury will be properly instructed on the defendant's duty to preserve evidence and on the jury's discretion to draw an adverse inference from a bad-faith destruction of evidence." Britton v. Wal-Mart Stores, E. L.P., 4:11-cv-32 (N.D. Fla. July 28, 2011).

[6] SunTrust admits "that such video, according to the face of the Security Retention Policy (See D.E. 83-5), suggests that the video observed by Rogers should have been retained for two years." (Doc. # 164 at 10, n.4).  The Court rejects SunTrust's argument that it should not be held responsible for the destruction of the evidence in question because the EEOC neglected to depose Rogers, the individual who watched the videos before they were taped over. The record shows that the evidence in question was always under the exclusive custody and control of SunTrust, and EEOC's litigation strategy, including its decision not to depose Rogers, does not exonerate SunTrust.

requests even where there is an indisputable destruction or loss of the evidence. See, e.g., Socas v. N.W. Mut. Life Ins. Co., No. 07-20336-civ-Simonton, 2010 U.S. Dist. LEXIS 108696 (S.D. Fla. Sept. 30, 2010)(denying motion for adverse inference jury instruction when doctor negligently failed to suspend her ordinary policy of purging inactive patient files after learning the information in the files was relevant to her disability claim); Managed Care Solutions, Inc., 736 F. Supp. 2d at 1332 (denying spoliation sanctions even though the defendant deleted emails and failed to place a litigation hold on documents); Walter v. Carnival Corp., No. 09-cv-20962-civ-Hoeveler/Garber, 2010 U.S. Dist. LEXIS 74307 (S.D. Fla. July 23, 2010)(denying spoliation sanctions even though cruise line admitted that it lost the broken chair that was alleged to have caused an injury to a cruise passenger).

At this juncture, the Court does not reach the conclusion that SunTrust acted in bad faith and denies without prejudice the EEOC's request for an adverse inference jury instruction.  The Court may reconsider this determination at a later date if it is presented with further evidence tending to show bad faith conduct by SunTrust.  The Court, however, will permit the EEOC to introduce evidence at trial concerning SunTrust's video surveillance system, SunTrust's policies relating to the use and preservation of video

surveillance footage, and SunTrust's failure to preserve the video footage at issue.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

The EEOC's Motion for an Adverse Jury Instruction (Doc. # 141) is denied without prejudice to the extent the EEOC requests an adverse inference jury charge but is granted to the extent that the EEOC may introduce evidence at trial concerning SunTrust's video surveillance system, SunTrust's policies relating to the use and preservation of video surveillance footage, and SunTrust's failure to preserve the video footage at issue.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 7th day of April, 2014.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies to: All Counsel of Record